**AETNA CASUALTY AND SURETY COMPANY, a Connecticut Corporation, et al., Plaintiffs,**

v.

**JEPPESEN & COMPANY, a Colorado Corporation, Defendant.**

**No. CIVIL–LV 1467 PMH.**

United States District Court, D. Nevada.

Dec. 18, 1978.

Rex A. Jemison, of Beckley, Singleton, DeLanoy & Jemison, Las Vegas, Nev., for plaintiffs.

Philip R. McCowan, and Robert J. Popelka, of Popelka, Allard, McCowan & Jones, San Jose, Cal., for defendant.

## MEMORANDUM AND ORDER FOR JUDGMENT

PEIRSON M. HALL, Senior District Judge.

█ The Court has heretofore indicated, inasmuch as the accident here occurred prior to the enactment of the Nevada statutes on contribution and indemnity and there being no applicable Nevada case law, that the Supreme Court of Nevada, if called upon, would follow California case law. California adopted the comparative fault doctrine in the *Li* case in 1975; and has since enlarged that doctrine so as to apply it to product liability and to contribution and indemnity cases.[1]

However, except for the statement at the conclusion of the argument of counsel for defendant that Jeppesen could be no more than 5% at fault, the case was tried by each counsel on the basis that the other party was wholly at fault.

█ Although the Court, in a previous memorandum, concluded that the defendant here was foreclosed from trying the question of pilot fault under the doctrine of *res judicata* by virtue of the verdict in the *Schulze-Fitzpatrick* cases, counsel for the plaintiffs herein chose to leave the question of the fault of Bonanza open, whether pilot or otherwise. Under the doctrine of *Barker v. Lull, supra*, when the plaintiff proves that the product was a proximate cause of the accident, the burden shifts to the defendant to prove that on balance the benefits of the challenged product or its design outweigh the risk of danger inherent in such design.

█ Having due regard for that rule, after a careful review of all of the evidence of the case and, after re-reading the entire transcript, the Court is satisfied that the preponderance of evidence shows that:

1. The landing chart was defective;

2. The defect was the main proximate cause of the accident;

3. The pilots were without fault; and

4. The management of Bonanza failed in the discharge of its duty of highest care to the passengers, which fault contributed to the accident.

The difficulty here is in determining the ratio of fault between Bonanza and Jeppesen. There is no mathematical or other formula known that can be used by this Court or by a jury in making that determination. But a consideration of the consequences of fault on the part of each of the parties and the possible damages which might arise from such fault, whether in design or conduct, or both, does point a way to a resolution of that very difficult problem.

The extent of the possible loss of life from fault by an air carrier is limited to the occupancy of one plane at the time of the commission of the fault, i. e., on a plane-by-plane and trip-to-trip basis.

---

1. *Li v. Yellow Cab Co. of California*, 1975, 13 Cal.3d 804, 119 Cal.Rptr. 858, 532 P.2d 1226. *Barker v. Lull Engineering Co.*, 1978, 20 Cal.3d 413, 143 Cal.Rptr. 225, 573 P.2d 443. *American Motorcycle Ass'n v. Superior Court of Los Angeles County*, 1978, 20 Cal.3d 578, 146 Cal. Rptr. 182, 578 P.2d 899. *Daly v. General Motors Corp.*, 1978, 20 Cal.3d 725, 144 Cal.Rptr. 380, 575 P.2d 1162. *Safeway Stores, Inc. v. Nest-Kart*, 1978, 21 Cal.3d 322, 146 Cal.Rptr. 550, 579 P.2d 441.

■ On the other hand, the extent of the possible loss of life which can result from a faulty landing chart is so very much greater that it is awesome to contemplate. Jeppesen makes its landing charts not only for every commercial airport in the United States (about a thousand), but they are also used by every certificated and uncertificated carrier (as well as private planes) in the United States. It also makes charts for every commercial airport in the world. The awesome responsibility of Jeppesen is brought home when it is considered that there were over 228,000,000 boardings of commercial carriers in the United States in the year ending March 1978. That means that for every hour of every day there are literally thousands of passengers and crew members of planes which are dependent for their lives upon the Jeppesen charts being accurate in what they purport to represent, being quickly legible and readily comprehensible. The chart here failed in all three respects.

■ The failure of Bonanza to exercise any supervision over the distribution of the charts to, or the receipt by, the pilots, of the many charts (67) contained in Bonanza's Manual of Landing Charts must be considered as a failure on the part of Bonanza to exercise the highest degree of care which it owed not only to the pilots but to the passengers of its planes as well. The evidence was that the custom was for Bonanza to provide a manual of charts but that the corrections and changes and insertions of new ones were sent to the pilots individually from Jeppesen leaving it up to the pilots entirely, not only to examine them carefully before using them, but also to note additions and changes and peculiarities, if any. The lack of that duty is demonstrated in this case. The pilots had recently received and placed in their book Landing Chart No. 3. Neither had ever used it and they were given instructions to use it while in a blinding snow storm 18,000 feet over the mountains in pitch dark with icy conditions and only a red light on the steering post to read the chart. The highest duty of care was not discharged by a mere generalized requirement by Bonanza that the pilot should become familiar with new charts. The highest duty of care requires nothing less than a careful policing of awareness of the pilots of changes, additions and deletions.

The material and data reflected in the graphics of a chart is neither produced nor verified by Jeppesen, but is furnished to Jeppesen by the United States government by what is known as F.A.A. Form No. 511. That is a mimeographed or xeroxed compilation of data. The 511 chart from which Jeppesen made L.V. No. 3 had eight columns with four entries in each column and in addition, it had over 300 words of text. Jeppesen undertakes to reduce all of that to a graphic picture with a plan view and a profile view so that it is quickly legible and instantly understandable by a pilot called upon to use it. This undertaking as to how the information in Form 511 will be presented in the charts is solely on its own account, is not a part of the governmental operation and is calculated to produce a three dimensional picture of all of the information in the Form 511. Jeppesen does all this without any supervision from the F.A.A. or any other governmental agency.

The defendant's charts in both the profile and plan view are to scale on the horizontal and not the vertical.

The plaintiffs do not challenge the accuracy of the figures shown on landing chart L.V. No. 3, but they do point out the gross disparity of 5 to 1 in that chart between the scale of the profile view and the scale of the plan view; whereas, the majority of all the other 67 charts in the manual, except a very few, have a profile scale of a difference of about 1 to 1 when compared to the plan view. Moreover, Jeppesen after this accident revised the chart and conformed the scale on the profile view with the scale of the plan view on L.V. No. 3. Furthermore, if Jeppesen had any other charts comparable to L.V. No. 3, showing any such disparity between the plan view and profile view among the tens of thousands of charts it has printed, it is quite certain that such charts would have been produced.

As I indicated above, the difficulty in reaching a conclusion is as to comparative fault between Jeppesen and Bonanza, but the Court concludes from all the evidence and testimony that the evidence preponderates to the conclusion that Jeppesen was 80% at fault and Bonanza was 20% at fault. Counsel will prepare findings accordingly and judgment based on the total amount of damages paid, which is not contested as to amount.

No useful purpose would be served by detailed analysis of all of the evidence, but, a few comments on some of the evidence will be helpful. Defendant, through its witness, Mr. Soderlind, showed a video tape of Mr. Soderlind at the pilot's position in a stationary trainer for the same type of plane as in the crash. The Court permitted it on the belief that it would show conditions similar to those under which the pilot Fitzpatrick was flying at the time of the crash. It did not turn out that way, but rather the effort was made to convince the Court that the chart was plainly and clearly legible. The film was made under strong television camera lights. This bit of evidence was so far fetched that had this been a jury trial and the video tape had been shown to the jury, this Court would have declared a mistrial. One further effort on the part of defendant discredited its whole line of testimony when it attempted to base its position upon the proposition that pilot fault caused the TWA crash near Berryville, Virginia on December 1, 1974, and thus pilot fault was the cause of the crash in the instant case. The facts of that crash had utterly no relevance to this case because of the difference in all of the surrounding facts and circumstances of each. Further, the Court takes judicial notice that the NTSB Report on that crash by its conclusion Nos. 14, 15, 16, 17, 18 and 19 point to serious fault on the part of F.A.A., the A.T.S. facilities and system and of the profile view of the chart.

The plaintiffs' witness, Dr. Besco, is a psychologist. His testimony was unusual, but whatever skepticism the Court might have had during his direct testimony disappeared upon his cross-examination by the defendant and upon the cross-examination of defendant's witnesses.

The testimony of other pilots who landed in Las Vegas that night using L.V. No. 3 loses credibility when considered that this was one of thousands of flights which the pilots have flown since the crash 13 years ago. And furthermore, the pilots were not produced at the previous trial.

Plaintiffs' counsel will prepare findings of fact and conclusions of law and submit the same. The Court intends to hold no hearings on any objections that may be filed thereto. Consequently, plaintiffs will submit at the same time a proposed form of judgment, and defendant may file formal written objections thereto.