**[J-1-2023] [OAJC: Mundy, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

| | |
|---|---|
| MICHAEL AND MELISSA SULLIVAN, H/W | : No. 18 EAP 2022 |
| | : |
| | : Appeal from the Judgment of |
| v. | : Superior Court entered on April 15, |
| | : 2021 at No. 3086 EDA 2019 |
| | : (reargument denied June 23, 2021), |
| WERNER COMPANY AND LOWE'S | : affirming the Judgment entered on |
| COMPANIES, INC., AND MIDDLETOWN | : November 19, 2019 in the Court of |
| TOWNSHIP LOWE'S STORE #1572 | : Common Pleas, Philadelphia |
| | : County, Civil Division at No. |
| | : 161003086. |
| APPEAL OF: WERNER COMPANY AND | : |
| LOWE'S COMPANIES, INC. | : ARGUED: March 8, 2023 |

**DISSENTING OPINION**

**CHIEF JUSTICE TODD**                    **DECIDED: December 22, 2023**

The Opinion Announcing the Judgment of the Court ("OAJC") concludes that governmental and industry standards evidence is categorically inadmissible by the defense in a strict liability action to show a product is not defective. In doing so, the OAJC perpetuates a vestige of the highly criticized and recently overruled decision in *Azzarello v. Black Brothers Co., Inc.*, 391 A.2d 1020 (Pa. 1978); eschews the recent teachings of this Court in *Tincher v. Omega Flex, Inc.*, 104 A.3d 328 (Pa. 2014); rejects the sound approach taken by virtually all of our sister states; accepts the patent unfairness of nonetheless allowing such evidence to be admissible in a plaintiff's case to show a product *is* defective; and deprives juries of potentially valuable and relevant information, all seemingly out of a misplaced fear that the jury will be misled or confused. For the reasons that follow, I respectfully dissent.

A brief history of the admissibility of governmental and industry standards gives important context to the issue before us. The development of a sophisticated industrial society with its proliferation of new and complex products inspired a shift in legal philosophy, from the principle of *caveat emptor* which prevailed in the early 19th century to the view that a manufacturer and supplier of a product should be deemed to be the guarantor of their products' safety and bear the risk of loss for injury resulting from a defective product. Ultimately, this view was codified in Section 402A of the Restatement (Second) of Torts, and adopted by our Court in *Webb v. Zern*, 220 A.2d 853 (Pa. 1966). While the focus of Section 402A and the view it codified was, and is, on manufacturers and suppliers, governmental and industry standards evidence was admissible at this juncture, and we rejected attempts to preclude the admissibility of such evidence. *See*, *e.g.*, *Forry v. Gulf Oil Corp.*, 237 A.2d 593, 598 n.10 (Pa. 1968) (finding a departure from a custom in the tire industry as to the length of tire "overlaps" allows for a reasonable inference that a variance from that custom created an unreasonable danger); *Bialek v. Pittsburgh Brewing Co.*, 242 A.2d 231, 235 (Pa. 1968) (rejecting suggestion that governmental and industry standards should be excluded in product liability cases).

In the wake of *Azzarello*, however, which created a distinct divide between strict liability and negligence theories of recovery and declared that negligence concepts had no place in Pennsylvania strict liability doctrine, governmental and industry standards evidence in strict liability actions was prohibited. *See Lewis v. Coffing Hoist Division, Duff-Norton Co.*, 528 A.2d 590, 594 (Pa. 1987) (relying upon *Azzarello*'s negligence/strict liability dichotomy in determining that, because negligence concepts have no place in strict liability, the admission of industry standards, which go to the reasonableness of the defendant's conduct in product design, would improperly inject concepts of negligence and mislead the jury).

Our recent decision in *Tincher*, however, revisited *Azzarello*, ushering in a sea-change in the law.[1] In doing so, the *Tincher* Court considered the sharp criticism of *Azzarello*'s strict separation between negligence and strict liability concepts in design defect cases. The Court underscored that Section 402A relieves plaintiffs of the burden of proving the absence of due care in the manufacturing process, but that this did not, however, necessarily apply in design defect cases where "the character of the product and the conduct of the manufacturer are largely inseparable." *Tincher*, 104 A.3d at 424. Finding that the separation between negligence and strict products liability "fail[ed] to reflect the realities of strict liability practice and to serve the interests of justice", the *Tincher* Court overruled *Azzarello*. *Id*. at 376. The *Tincher* Court recognized that strict liability overlaps in effect with theories of negligence and restored the inquiry into whether a product is "unreasonably dangerous" under Section 402A to the jury. Under *Tincher*, the calculus for finding liability has been altered. Now, to establish a design defect as unreasonably dangerous, a plaintiff may prove that a product is defective under a "composite" approach, by showing that either: (1) the danger is unknowable and unacceptable to the average or ordinary consumer ("consumer expectations standard") (not at issue in this matter); or (2) a reasonable person would conclude that the probability and seriousness of harm caused by the product outweighed the burden or costs of taking precautions ("risk-utility standard").

---

[1] While *Tincher* did not expressly overrule *Lewis*, the Court recognized that its decision to overrule *Azzarello* and articulate a standard of proof premised upon alternative tests in relation to design defect claims would have an impact upon other foundational issues which were constructed from *Azzarello,* but determined that consideration of those effects was outside of the scope of the appeal. *Tincher*, 104 A.3d at 409-10. We observe, however, that *Lewis* was wholly dependent upon *Azzarello*'s negligence/strict liability dichotomy. The *Lewis* Court determined that, because under *Azzarello* a manufacturer was a guarantor of product safety, such entity's due care had no bearing on strict liability. Given its underpinnings, it is clear that *Lewis* did not survive the demise of *Azzarello* and should be expressly overruled.

Under the risk-utility standard at issue herein, the seven "Wade factors," or certain of these factors, may be utilized. *See* J. Wade, *On the Nature of Strict Tort Liability for Products*, 44 Miss. L.J. 825, 837-38 (1973). These factors, which the factfinder may balance to determine whether a product is defective, are:

> (1) [t]he usefulness and desirability of the product – its utility to the user and the public as a whole.
>
> (2) [t]he safety aspects of the product – the likelihood that it will cause injury, and the probable seriousness of the injury.
>
> (3) [t]he availability of a substitute product which would meet the same need and not be as unsafe.
>
> (4) [t]he manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.
>
> (5) [t]he user's ability to avoid danger by the exercise of care in the use of the product.
>
> (6) [t]he user's anticipated awareness of the dangers inherent in the product and their availability, because of general public knowledge of the obvious condition of the product, or the existence of suitable warnings or instructions.
>
> (7) [t]he feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance.

*Tincher*, 104 A.3d at 389-90.

In light of our adoption of the composite approach to products liability, including both consumer expectations and risk-utility theories of recovery, it is clear, in my view, that governmental and industry standards may be relevant in resolving the question of whether a product design is unreasonably dangerous. Specifically, as we stated in *Tincher*, the character of the product and the conduct of the manufacturer are largely inseparable, calling for the introduction of standards and regulatory compliance when conduct is at issue. A product's failure to comply with governmental or industry standards

alone may allow the jury to infer that a product design is unreasonably dangerous. If a product design departed from custom, it could be reasonably inferred that such variance rendered the product unreasonably dangerous and, thus, that the product was defective. Conversely, compliance with governmental or industry standards may shed light on the appropriate balance of safety risks and benefits regarding a manufacturer's design. Specifically, widespread industry adoption of safety features and compliance with OSHA safety mandates and voluntary safety standards could assist in determining a product's technological feasibility and its cost, both of which are relevant in comparing the product at issue with an alternative design. Thus, admitting evidence of governmental and industry standards may be relevant to the question of whether a product is defective.

Moreover, governmental and industry standards evidence should be admissible not only because of *Tincher*'s reform of strict liability law, but because it is entirely consistent with, if not mandated by, our broad allowance for the admissibility of relevant evidence under our Pennsylvania Rules of Evidence. Specifically, in 1998, our Court approved the Rules of Evidence, and Rules 401 and 402, which codified a liberal approach to relevancy and admissibility. Critically, evidence is "relevant" if "it has *any* tendency to make a fact more or less probable than it would be without the evidence." Pa.R.E. 401(a) (emphasis added); Pa.R.E. 402; *Commonwealth v. Yale*, 249 A.3d 1001, 1022 (Pa. 2021). Thus, under Pennsylvania's broad relevancy rules, governmental and industry standards should be admissible in products liability design defect matters.

Additionally, the overwhelming majority of our sister states find governmental and industry standards evidence to be admissible. As set forth by *amicus* Product Liability Advisory Counsel, *Amicus* Brief at 3-12, the vast number of states regard compliance with mandatory governmental safety standards (44 states) and voluntary industry safety standards (46 states) to be relevant and admissible. By contrast, the OAJC's view,

forbidding the admission of such standards, has been adopted by only one state – Montana. Indeed, *Tincher*'s composite design defect standard was largely based upon California's similar test, and that state has held governmental and industry standards evidence to be admissible in strict liability litigation. *See Kim v. Toyota Motor Corp.*, 424 P.3d 290, 299 (Cal. 2018) (holding industry custom may be relevant in a strict liability design defect case as it illuminates the relative complexity of design decisions and the tradeoffs frequently required in the adoption of alternative designs, as well as highlighting that a defendant has not implemented a safety feature that is standard in the industry).[2]

---

[2] The concurrence suggests that I (1) rely "heavily" upon the California Supreme Court's decision in *Kim*; (2) that *Kim* is distinguishable because it involved "custom and usage" in the industry which is "due care" evidence; (3) that *Kim* "relied" on the Third Restatement; and (4) that *Kim* is contrary to our approach in *Tincher*. Concurring Opinion (Donohue, J.) at 7-8 n.11. Respectfully, the concurrence misapprehends my position.

First, I cite to *Kim* merely to provide one of the many examples of the virtual unanimity of courts in allowing the admission of governmental and industry standards. Second, contrary to the seeming distinction the concurrence draws between industry and government standards and due care evidence, the Superior Court below, Appellees, and the OAJC all at least suggest that the admission of industry and governmental standard evidence goes to the question of due care. *See Sullivan v. Werner Co.*, 253 A.3d 730, 747 (Pa. Super. 2021) ("Whether a manufacturer has complied with industry or government standards goes to whether it 'exercised all possible care in preparation of product' in making the design choice, not on whether there was a design defect in the product itself. . . . [I]t is irrelevant if a product is designed with all possible care, including whether it has complied with all industry and governmental standards."); Appellees' Brief at 24 ("The probative value of industry or government standards is to show that the manufacturer has used care in the preparation and sale of its product."); OAJC at 24 n.13 ("our analysis remains apt as evidence that a manufacturer designed its product to conform to ANSI, OSHA, or any third-party standards goes to the manufacturer's due care in designing a product"). Third, *Kim* did not rely on the Third Restatement, but merely noted that its conclusion was "consistent with the general approach taken in the [Third] Restatement." *Kim*, 424 P.3d at 299 n.5. Fourth, and finally, *Kim* is particularly relevant given the *Tincher* Court's explanation that, while not adopting the Third Restatement, "appreciation of certain principles contained in that Restatement has certainly informed our consideration of the proper approach to strict liability in Pennsylvania in the post-*Azzarello* paradigm." *Tincher*, 104 A.3d at 335. One of these areas of consideration was *Tincher*'s adoption of a composite design standard, *id.* at 401, which was largely based upon California's composite design standard, *id.* at 402 (citing *Barker v. Lull Engineering*
(continued…)

Even more compelling, governmental and industry standards *are* admissible in a plaintiff's case. *Gaudio v. Ford Motor Co.*, 976 A.2d 524, 544 (Pa. Super. 2009). In my view, it is patently unfair to allow such standards into evidence in a plaintiff's case, but not in the defense's case. If evidence of governmental and industry compliance was irrelevant to strict liability, then such evidence should be inadmissible for both plaintiff and defendant alike.

Finally, the OAJC's exclusion of governmental and industrial standards to defend against a defective product claim, at its core, reflects a mistrust of our jury system and suggests juries cannot understand these complex matters. Indeed, the OAJC's approach could actually cause jury confusion, as was evident in this case when the jury inquired about OSHA inspections of the scaffolding alleged by Appellees to be defective. *See* N.T., 5/9/19, at 142.

Our entire jury system relies upon the adversarial presentation of evidence and argumentation. It should be no different in the area of products liability. Of course, governmental and industry standards should be admitted only after a proper foundation has been laid, will be subjected to cross-examination and rebuttal, and the jury will be guided by appropriate instructions. But the jury should be allowed to decide the value, weight, and reliability of such evidence. Moreover, traditional safeguards against unfair prejudice, issue confusion, and the misleading of the jury would be available, on a case-by-case basis, just as in any other area of litigation. *See* Pa.R.E. 403.

In short, the demise of *Azzarello*, the substantive realignment of strict liability concepts articulated in *Tincher*, the liberal understanding of relevant evidence under our Rules of Evidence, the patent unfairness of permitting such evidence in the plaintiff's case

---

*Co.*, 573 P.2d 443 (Cal. 1978)). It is under this same standard that, in California, governmental and industrial standards are admissible. *Kim*, 424 P.3d at 299.

but not the defense, and the lack of jury confusion with traditional safeguards of the admissibility of evidence, all support the admissibility of governmental and industry standards evidence in strict liability litigation to show a product is not defective.[3]

Justice Brobson joins this dissenting opinion.

---

[3] The concurrence, citing an "undeveloped evidentiary record and undirected advocacy," contends that Appellants failed to establish the relevance of industry standards and place into the record information regarding ANSI standards. Concurring Opinion (Donohue, J.) at 1, 4. It appears the concurrence is *sub silento* affirming on these alternative grounds, as neither the parties nor the lower tribunals make similar assertions.