Filed 7/22/14  Shirk v. Builders Fence Supply CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| SAMUEL SHIRK, a Minor, etc.,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>BUILDERS FENCE COMPANY, INC.,<br><br>    Defendant and Respondent. | F066015<br><br>(Super. Ct. No. 10-236232)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Barry Hammer, Judge.  (Retired Judge of the San Luis Obispo County Sup. Ct. assigned by the Chief Justice pursuant to article VI, § 6 of the Cal. Const.)

Fitzgerald & Lundberg, Ken M. Fitzgerald and Barbrae Lundberg, for Plaintiff and Appellant.

Lewis, Brisbois, Bisgaard & Smith, Cary L. Wood, Jeffry A. Miller and Arezoo Jamshidi, for Defendant and Respondent.

-ooOoo-

Rebel Fence Company (Rebel), a licensed contractor, installed a fence and gates at the home of Jennifer Shirk and her two sons, Adam and Samuel.[1] Rebel purchased the parts for the installation, with the exception of a gate stop and roller guides, from defendant Builders Fence Company, Inc. (Builders), a manufacturer of ornamental iron fences and gates. When it installed the fence and gates, Rebel also installed a gate stop that it designed and built itself. Five years later, one of the manual gates fell on top of nine-year-old Samuel as he was trying to close it, injuring him. Adam witnessed the accident. The gate fell because the gate stop was inadequate to stop the gate.

Samuel and Adam Shirk, through their guardian ad litem Jennifer Shirk, sued Builders and Rebel for strict products liability based on a design defect and failure to warn, negligence, and negligent infliction of emotional distress. Before the jury trial, the Shirks settled with Rebel and dismissed Adam from the case. The jury subsequently found in Builders' favor on the strict products liability and negligence claims.

Samuel appeals, arguing the judgment cannot be sustained on strict liability grounds. Samuel contends that the trial court erred when it (1) refused to give the jury a special instruction he requested regarding liability for defects regardless of their source, (2) denied his purported request for an instruction that the gate stop was part of the complete gate system, and (3) permitted the jury to be instructed on comparative fault. He also asserts there is insufficient evidence to support the jury's findings on causation and that Builders did not fail to adequately warn. We find no merit in Samuel's contentions and affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Builders manufactures component parts for various sizes and styles of ornamental iron fences and gates. It sells its products, which include fence panels, gates, roller,

---

[1] We refer to the Shirks by their first names to ease the reader's task. No disrespect is intended.

guideposts and gate stops, only to licensed C-13 contractors. Builders manufactures all the parts necessary to install a gate. Licensed contractors, however, must tell Builders exactly which parts and hardware they want to purchase. After a licensed contractor designs the fence and gate system for a particular location, the contractor is responsible for the complete material list for the job.

There are numerous types of gate stops; Builders sells two types. According to a project manager for Builders, Steve Frankel, Builders is the only manufacturer of which he is aware that sells a gate stop of any kind. When purchasing from Builders, licensed contractors purchase the gate stops separately; they are not included in the base price of a gate system. Certain factors, such as the terrain and the size of the gate's wheels, dictate the type of gate stop needed to be effective. Sometimes a gate stop is unnecessary, such as when a rolling gate runs into the side of a wall or building.

Frankel testified it is industry standard for a contractor to provide and install his or her own gate stop. Builders assumes contractors know which gate stop to use. The catalogs that come with automatic openers contain information about which stops need to be placed on those gates, and OSHA regulations require stops on rolling gates in industrial settings. Builders does not provide instructions or warnings to contractors regarding the importance of having a gate stop, nor does it train sales staff to discuss gate stops or safety issues with those placing orders; the sales staff just takes the contractor's order.

Rebel is a licensed C-13 contractor who installs wood, chain link, ornamental iron and vinyl gates and gate operators. Rebel had been a customer of Builders for over a decade and routinely bought products from Builders. When placing orders, Rebel tells Builders the parts needed for a particular installation; it does not provide Builders with a layout of the fence or gate. As Rebel's manager, Nicholas Moser, explained: "Whenever I place my orders, I usually order this many panels, this many posts and then like a roll gate, with overhead track hardware or with pipe track hardware." Rebel at times

3.

purchases various component parts from Builders. No warnings come with the products Rebel purchases from Builders.

In 2003, Jennifer Shirk purchased a fence and gate system for her home from Rebel for approximately $18,000. After custom designing the system, Rebel placed an order with Builders to supply the needed parts, including gate panels, roll gates, tracks and posts. Rebel purchased upgraded, maintenance-free wheels for use in the system; Moser, who was not involved in any way with the Shirk job, did not know whether the wheels were purchased from Builders or another company. Rebel, however, did purchase the roller guides from another company. The remaining parts were purchased from Builders. As part of the system, Rebel installed three gates: a manual gate on each end of a circular driveway and an automatic gate on another driveway. Rebel designed, manufactured and installed the gate stops at the Shirk home without Builders' involvement.

Five years later, when nine-year-old Samuel tried to shut one of the manual gates on the circular driveway, the gate fell on top of him. Samuel suffered a compound fracture of his left arm and a concussion. Samuel's brother, Adam Shirk, was standing next to the gate when it fell.

James Flynn, Shirk's retained expert in forensic engineering, testified that Rebel's gate stop placed "negligible" resistance on the gate. It was really a wheel stop, not a gate stop, because it was merely a piece of one quarter inch angle iron laid on top of the track and welded in place, creating a "tiny bump." It did not come up against the gate. The stop should have been tested after installation to see if it was adequate. Flynn admitted Builders had no involvement in designing the gate stop or installing it on the track. In Flynn's opinion, this accident could have been avoided by installing a gate stop, such as the ones Builders manufactures, that actually comes into contact with the gate.

Although the probability of an accident is not great, since the consequences could be extreme Flynn believed contractors should be warned to install a gate stop which

4.

meets the specifications that are at least equivalent to the gate stops Builders sells. Flynn conceded, however, that Builders was "selling to people who you would expect would know how to put a gate stop in, and the gate stop they put in would be effective because you're supposedly selling to licensed contractors." Flynn did not know whether other manufacturers of gate parts provide warnings with their products. In his opinion, Builders sold Rebel a gate system and, in doing so, should have warned Rebel about the need for a gate stop.

Sometime after the accident, Jennifer hired David McDermott, a self-employed contractor who holds a C-23 ornamental iron contractor's license, to fix the gate. McDermott installed a replacement gate stop and another set of guide rollers. He opined Rebel's gate stop was "substandard" because the gate will roll over anything below the center line of the wheel. While the type of stop that should be used varies from situation to situation, typically it should contact the gate frame, not just the wheel. According to McDermott, it is standard in the industry for a licensed fencing contractor to fabricate his or her own gate stop, and McDermott generally fabricates his own stops. McDermott became aware of how to build an adequate gate stop based on common sense, which tells him that the stop needs to come in contact with the gate. McDermott agreed that a contractor decides in the field, based on the application, whether a gate stop is needed and, if so, what type to use and where to put it.

McDermott has come across a lot of substandard work by contractors, especially as it relates to gate stops. Based on what he has seen in the field, he does not think one can validly assume a C-13 contractor should know how to install an adequate gate stop. McDermott feels Builders should warn contractors about gate stops and give a warning with every gate and frame they sell, no matter what other parts the contractor orders.

Moser admitted the accident resulted from Rebel's failure to install a proper gate stop and agreed that Rebel took full responsibility for Samuel's injury that was caused by the gate running over the stop that Rebel designed, manufactured and installed. As of

5.

July 2011, Rebel periodically had a number of Builders' gate stops in stock; Rebel's installers would either use one of these stops or fabricate their own in the field. At that time, Rebel knew it could fabricate stops like the ones Builders made. Moser also knew that at the time he obtained his contractor's license. Rebel no longer uses the type of gate stop installed at the Shirk home. Instead, Rebel purchases gate stops from Builders.

It is obvious to Moser that a positive gate stop is necessary to ensure the gate does not roll off the end of the track, and he did not need to be warned or reminded that a gate stop is necessary to ensure the safety of others. Moser, however, also testified that Rebel would have followed any instructions from Builders regarding what constitutes an adequate gate stop. When asked how a warning would help him, Moser responded that "[i]t wouldn't hurt." Moser claimed Rebel was competent to decide whether a gate stop was needed and where to place it, and he tells his employees to put adequate stops on gates.

Builders' retained expert, Dr. Mac Anthony Quan, a mechanical engineer, testified that Rebel's gate stop was "sorely inadequate." The stop Rebel installed was a piece of angle iron that attached to the back of the V-track, which was supposed to act as a stop when the wheel contacted it. Quan opined that Rebel's stop design was defective because it had insufficient capacity to stop normal opening of the gate. The defect should have been obvious right away had the gate stop been tested after installation. Quan performed an accident reconstruction, in which he found that the gate's rear or trailing wheel was past the stop before Samuel attempted to move the gate, with the leading edge still within the guide rollers. When Samuel pulled the gate further back and then started to push it toward the closed position, the leading edge left the rollers and the gate fell.

Quan determined that Builders did not supply the gate stop, the six-inch Elite V-groove wheels and the six-inch Jansen guide rollers that were installed with the gate, but did supply the frame structure and possibly the guideposts. In Quan's opinion, Builders is a wholesaler of parts to the fence and gate industry; it does not sell complete gate and

fencing systems because "[y]ou don't have a gate system till everything's in place and set." Quan believes "a gate system is not a gate system until it is actually installed."

Rebel had in its possession a document from Builders that provides specifications for the gate; included in the specifications on installation is a statement that "[t]he contractor shall install any gate stops that may be required." Rebel produced the document in discovery in the case, although Moser testified he had never seen it before. Quan opined that as a C-13 licensed contractor, it is assumed or expected that Rebel would know that gate stops are required on gates, as that information is included in materials for the license examination. Moreover, Rebel does installations at industrial and commercial facilities, including automatic and manual gates; specifications for automatic vehicular gate construction state that positive stops are required on gates. Quan did not believe it would have made a difference had Builders warned Rebel that the gate could fall over if a proper, adequate gate stop was not installed, because Rebel is a C-13 licensed fence and gate contractor, Rebel knew it needed to install a stop, and it also knew that without one, the gate could come off the track. Moreover, Rebel already had an example of an adequate stop since it was aware of the stops Builders manufactured. Instead of using one of those stops, it chose to use its own design which proved to be inadequate.

*Motion for Nonsuit*

Before Quan's testimony, Builders moved for nonsuit asserting Samuel failed to establish a viable theory of liability or causation. Builders' counsel argued the evidence established that Rebel was a C-13 contractor who ordered component parts from Builders and installed the gate system. Although Rebel knew the risk of an inadequate gate stop and that Builders sold gate stops, it chose not to order a gate stop from Builders. Instead, Rebel designed and fabricated the defective gate stop, which failed to properly stop the gate. Builders had no involvement with the design or fabrication of the gate stop.

7.

Samuel's counsel responded that under strict liability, a manufacturer of a completed product cannot escape liability by tracing the defect to a component part supplied by another. He contended Builders was not a seller of just component parts, but a manufacturer who sold to retailers in the chain of distribution; it relied on C-13 contractors to install a gate stop without providing a stop or instructions for its installation. Samuel's counsel claimed the jury could find for Samuel under either the consumer expectation test or the risk-benefit test.

The trial court denied the motion. It determined the component parts defense did not apply because Builders' materials were not generic or off-the-shelf. Moreover, the gate was being used "for a sole and intended purpose . . . specifically as it was built, and that was the only thing it was built for." The court concluded that "the injury here is susceptible to a finding by the jury that the injury was caused by the gate itself. It was the gate that fell on the plaintiff. The risk was caused [] by the weight of the gate when it was upstanding."

*Closing Arguments*

Samuel's counsel argued to the jury in closing that the case was a simple one: "You have a gate that falls on a nine-year-old child because of an inadequate gate stop, a system that was not safe." He asserted the product was the gate and fencing system, and the product was defective in design because it did not have proper gate stops or instructions. Samuel's counsel pointed out "the law is that if you manufacture and sell a product, you mass produce it and you sell it, that you are responsible for any of – the damages that result from a defective product." He used Ford as an example, explaining that if Ford shipped a car out to its authorized dealer without brakes but with instructions for the dealer to install them, and the dealer did not do so correctly, Ford was responsible for damages caused by the defective brakes because it was in the chain of distribution for the car. Samuel's counsel asserted that was "what we have here," as Builders and Rebel were in the chain of distribution because Builders manufactured and sold the product, and

8.

Rebel took the product and sold it to Shirk. Therefore, both were equally responsible for defects in the product.

Samuel's counsel argued it was undisputed that the "gate system" was defective, that the defect caused Samuel's injuries, and that his injuries were serious. He asserted it was undisputed that Builders manufactured, distributed and sold the gate system, that it did not perform as safely as an ordinary consumer would expect, that Samuel was harmed, and the gate system's failure to perform safely was a substantial factor in causing Samuel's harm. He further argued the gate system was defective in design because it did not have an adequate gate stop. Finally, as pertinent here, he argued Builders was liable for failure to warn because it provided no information to installers as to what is a proper and adequate gate stop.

Builders' counsel argued that Builders was not strictly liable for a part that Rebel designed and installed. He argued Rebel knew both that a stop was needed and Builders had an angle stop that could be installed on gates; despite that knowledge, Rebel chose to use its own defective part. Builders' counsel asserted Builders sold parts that were specifically ordered, not a system, and told the jury it was up to them to decide what the system was. He asserted Builders was not responsible for failure to warn because Rebel knew a stop was needed. He argued Rebel was 100 percent responsible for Samuel's injuries, and the jury should apportion any damages awarded accordingly. He asserted Builders did nothing wrong and it was responsible only for those items it placed into the stream of commerce, not for items others put into the stream.

*Jury's Verdict*

The jury returned a special verdict in which it found in Builders' favor on each cause of action. The jury found Builders was not liable for strict products liability for (1) a design defect based on the consumer expectations test, (2) a design defect based on the risk-benefit test, or (3) failure to warn. It also found no liability for negligent failure to warn and negligent products liability.

Specifically, as pertinent here, the jury determined that Builders did "design, manufacture, distribute, or sell the Gate System, as designed and supplied by Builders . . ." With respect to strict products liability for a design defect based on the consumer expectation test, the jury found that (1) an ordinary consumer could form reasonable minimum safety expectations about the "Gate System[,]" and (2) the "Gate System" failed to perform as safely as an ordinary consumer would have expected when used or misused in an intended or reasonably foreseeable way, but unanimously found (3) the "Gate System's design" was not a substantial factor in causing harm to Samuel. With respect to the risk-benefit test for a design defect, the jury unanimously found both that the "Gate System's design" was not a substantial factor in causing harm to Samuel, and "the risks of the Gate System's design" did not outweigh the benefits of the design.

Finally, with respect to strict products liability based on failure to warn, the jury found (1) the "Gate System" had potential risks that were known or knowable in light of the scientific knowledge that was generally accepted in the scientific community at the time of manufacture, (2) the potential risks presented "a substantial danger to persons using or misusing the Gate System in an intended or reasonably foreseeable way[,]" and (3) ordinary consumers would not have recognized the potential risks. The jury unanimously answered "No," when asked: " Did Builders [] fail to adequately warn of the potential risks?"

*Samuel's Post-Trial Motions*

Samuel subsequently moved for judgment notwithstanding the verdict (JNOV) and new trial. In the JNOV motion, Samuel argued the undisputed evidence at trial established as a matter of law that the gate system's design caused his injuries. He contended that, as the manufacturer of the gate system, Builders was strictly liable for the entire gate system placed into the stream of commerce, including the defective gate stop. He also argued he should have prevailed under the risk-benefit test because there was no credible evidence the benefits of the gate's design outweighed the risks.

10.

In his new trial motion, Samuel argued the trial court erred in refusing to give his special jury instruction that the gate stop was a component part that did not relieve Builders of liability under strict products liability theory. According to Samuel, the trial court also erroneously refused to give instructions that the gate stop was part of the product. He further argued the evidence was insufficient to justify the verdict and the verdict was against the law.

In opposition, Builders argued Samuel failed to establish court error in refusing to give Samuel's proposed special jury instruction or that the jury's verdict was not supported by substantial evidence. Builders asserted the jury reasonably could have found that Rebel's failure to test the gate and gate stop after completing the installation was the complete cause of Samuel's injuries, and any purported error in failing to give the special instruction did not affect the result of the trial.

After oral argument and taking the matters under submission, the trial court denied both motions.

## DISCUSSION

*Jury Instructions*

Samuel contends the trial court incorrectly instructed the jury and erroneously refused to give instructions he requested.

"A party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by him which is supported by substantial evidence." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572 (*Soule*).) "A civil litigant must propose complete instructions in accordance with his or her theory of the litigation and a trial court is not 'obligated to seek out theories [a party] might have advanced, or to articulate for him that which he has left unspoken.'" (*Mesecher v. County of San Diego* (1992) 9 Cal.App.4th 1677, 1686.) "The propriety of jury instructions is a question of law . . . ." (*Cristler v. Express Messenger Systems, Inc.* (2009) 171 Cal.App.4th 72, 82.)

11.

Instructional error in a civil case is not grounds for reversal unless it is probable the error prejudicially affected the verdict. (*Soule, supra*, 8 Cal.4th at p. 580.) In determining whether instructional error was prejudicial, a reviewing court must evaluate "(1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled." (*Id.* at pp. 580-581, fn. omitted.)

"Instructions should state rules of law in general terms and should not be calculated to amount to an argument to the jury in the guise of a statement of law. [Citations.] Moreover, it is error to give, and proper to refuse, instructions that unduly overemphasize issues, theories or defenses either by repetition or singling them out or making them unduly prominent although the instruction may be a legal proposition." (*Fibreboard Paper Products Corp. v. East Bay Union of Machinists* (1964) 227 Cal.App.2d 675, 718.) Finally, "[e]rror cannot be predicated on the trial court's refusal to give a requested instruction if the subject matter is substantially covered by the instructions given." (*Id.* at p. 719; see *Hyatt v. Sierra Boat Co.* (1978) 79 Cal.App.3d 325, 335.)

Samuel asked the trial court to give the following special instruction: "Strict liability encompasses defects regardless of their source, and therefore a manufacturer of a product cannot escape liability by tracing the defect to a component part supplied by another." The special instruction was based on the case of *Vandermark v. Ford Motor Co.* (1964) 61 Cal.2d 256. Builders objected to the instruction and the trial court declined to give it.

Builders requested the jury be instructed with CACI No. 1207B, "Strict Liability – Comparative Fault of Third Person," as follows: "Builders [] claims that the negligence of Rebel [] contributed to Samuel Shirk's harm. To succeed on this claim, Builders [] must prove both of the following: [¶] 1. That Rebel [] was negligent or at fault; and [¶] 2. That this negligence or fault was a substantial factor in causing Samuel Shirk's harm.

12.

[¶] If you find that the negligence or fault of more than one person, including Builders [] and Rebel [], was a substantial factor in causing Samuel Shirk's harm, you must then decide how much responsibility each has by assigning percentages of responsibility to each person listed on the verdict form. The percentages must total 100 percent. [¶] You will make a separate finding of Samuel Shirk's total damages, if any. In determining an amount of damages, you should not consider any person's assigned percentage of responsibility. [¶] 'Person" can mean an individual or a business entity.'" The trial court decided to give the instruction over Samuel's objection.

Samuel's counsel argued the special instruction should be given, and CACI No. 1207B should not, because the case is a "chain of distribution case," in which Builders was the manufacturer and Rebel the installer, thereby making Builders responsible for any defects that existed at the time the product was shipped, namely the failure to include a gate stop with its product. Samuel's counsel asserted Builders was not relieved from responsibility merely because Rebel installed an inadequate gate stop. Builders' counsel responded that Builders (1) was not in the chain of distribution for the "wheel stop" that Rebel defectively designed, (2) was not responsible for Rebel's negligence and (3) under California law, was entitled to an apportionment of liability for the injury caused by the defective "wheel stop" and Rebel's negligence in failing to comply with the standard of care as a licensed C-13 fencing contractor. After hearing arguments, the trial court stood by its previous ruling on these instructions.

On appeal, Samuel contends the trial court erred in excluding his proferred special instruction and allowing the jury to be instructed with CACI No. 1207B. We begin with the special instruction, which was premised on *Vandermark*, *supra*, 61 Cal.2d 256. In that case, Vandermark and his sister were injured when he lost control of a Ford automobile he was driving; he purchased the car new from an authorized Ford dealer. (*Vandermark*, *supra*, 61 Cal.2d at p. 258.) The plaintiffs sued Ford and its dealer for negligence and breach of warranty, claiming there was a failure in the car's braking

13.

system.  The trial court granted Ford's motion for nonsuit on all causes of action, and a directed verdict in the dealer's favor on the warranty causes of action.  The jury returned a verdict for the dealer on the negligence claims.  (*Ibid.*)

Our Supreme Court, in reviewing the nonsuit and directed verdicts, noted that it must be taken as established that, when the car was delivered to Vandermark, the master cylinder assembly had a defect that caused the accident and that the defect was caused by some negligence in design, manufacture, assembly or adjustment.  (*Vandermark*, *supra*, 61 Cal.2d at p. 260.)   Ford contended it could not be held either strictly liable or negligent for placing the car on the market without proof that the car was defective when Ford relinquished control over it, pointing out that the car passed through two other authorized Ford dealers before it was sold to the dealer in question, who removed the power steering unit before selling the car to Vandermark.  (*Ibid.*)

The Supreme Court disagreed.  The Court noted that a manufacturer is strictly liable when an article it places on the market, knowing it will be used without inspection for defects, proves to have a defect that causes injury: "[s]ince the liability is strict it encompasses defects regardless of their source, and therefore a manufacturer of a completed product cannot escape liability by tracing the defect to a component part supplied by another." (*Vandermark*, *supra*, 61 Cal.2d at p. 261.)   The Court further explained that even before strict liability was recognized, the manufacturer of a completed product was subject to vicarious liability for the negligence of his suppliers or subcontractors that resulted in defects in the completed product.  (*Ibid.*)  The Court explained that "[t]hese rules focus responsibility for defects . . . on the manufacturer of the completed product, and they apply regardless of what part of the manufacturing process the manufacturer chooses to delegate to third parties." (*Ibid.*)

The Court noted that in the plaintiffs' case, Ford delegates the final steps in the process to its authorized dealers; rather than delivering cars to its dealers in which the ultimate purchaser can just drive away, it relies on its dealers to make the final

14.

inspections, corrections, and adjustments needed to make the cars ready for use. (*Vandermark*, *supra*, 61 Cal.2d at p. 261.)  The Court concluded that "[s]ince Ford, as the manufacturer of the completed product, cannot delegate its duty to have its cars delivered to the ultimate purchaser free from dangerous defects," it cannot escape liability on the ground that the defect in the car may have been caused by the acts or omissions of its authorized dealers.  (*Ibid.*)  Accordingly, the Court held that because there was evidence the plaintiffs were injured as a result of a defect that was present when Ford's authorized dealer delivered the car to Vandermark, the trial court erred in granting Ford's motion for nonsuit.  (*Ibid.*)  The Court also concluded the car dealer was strictly liable for defects in cars sold by it because, like manufacturers, car dealers are engaged in the business of distributing goods to the public and are "an integral part of the overall producing and marketing enterprise that should bear the cost of injuries resulting from defective products."  (*Vandermark*, *supra*, 61 Cal.2d at p. 262.)

Samuel's proposed special instruction was an incomplete recitation of the rule stated in *Vandermark*, i.e. that "a manufacturer of a *completed* product cannot escape liability by tracing the defect to a component part supplied by another."  (*Vandermark*, *supra*, 61 Cal.2d at p. 261 (italics added).)  As Builders points out, the rule has no application to the facts of this case.  First, the evidence establishes that Builders is not a manufacturer of a "completed product" as described in *Vandermark*.  While Builders sells gate parts used to create gate systems, it does not install or design the systems. Instead, this is done by licensed C-13 contractors who purchase parts from Builders. Unlike the relationship between a car manufacturer and its car dealer, Rebel is not an authorized dealer or retailer of Builders; instead, Rebel is an independent contractor responsible for ordering a complete material list and knowing how to build and install a particular gate.  Moreover, Builders did not sell Rebel a completed product. While Rebel purchased the majority of the parts for the fence and gate from Builders, it did not purchase rollers, guide posts or gate stops from Builders.  Rebel designed, manufactured

15.

and installed the defective gate stop.  Since Builders is not a manufacturer of a completed product, it cannot be held strictly liable for defects "regardless of their source." (*Vandermark*, *supra*, 61 Cal.2d at p. 261.)

In addition, under California strict products liability law, a manufacturer is only responsible for injuries caused by its own product.  (*O'Neil v. Crane Co.* (2012) 53 Cal.4th 335, 348 (*O'Neil*).)  While "[s]trict liability encompasses all injuries caused by a defective product, even those traceable to a defective component part that was supplied by another[,]" the reach of strict liability is not limitless.  (*Ibid.*)  As our Supreme Court has explained:  "We have never held that strict liability extends to harm from entirely distinct products that the consumer can be expected to use with, or in, the defendant's nondefective product.  Instead, we have consistently adhered to the *Greenman* [*v. Yuba Power Products, Inc.* (1963) 59 Cal.2d 57] formulation requiring proof that the plaintiff suffered injury caused by a defect in the defendant's own product.  [Citation.]  Regardless of a defendant's position in the chain of distribution, 'the basis for his liability remains that he has marketed or distributed  defective product' [citation], and that product caused the plaintiff's injury."  (*O'Neil*, *supra*, 53 Cal.4th at p. 348.)

In this case, the evidence showed Rebel manufactured and installed the defective gate stop in conjunction with the parts it purchased from Builders.  Builders' products were not defective; Rebel's gate stop was.  Samuel's theory that Builders manufactured a complete product, part of which included the defective gate stop, was not supported by substantial evidence.  The gate stop simply was not part of Builders' completed product, but instead was a part added by Rebel, who was neither a supplier, subcontractor or authorized dealer of Builders, *after* Builders sold its products to Rebel.  Accordingly, the trial court properly refused the special jury instruction.

Samuel next contends the trial court erred in refusing to instruct the jury that the gate stop was part of the completed product.  Samuel, however, never requested such an instruction.  He asserts he did so, pointing to a discussion regarding jury instructions that

16.

was placed on the record. While the record shows that Samuel's counsel lodged an objection to the trial court's refusal to give the special instruction based on *Vandermark* and its decision to give CACI No. 1207B, he did not request a separate instruction that the gate stop was part of the completed product. It was Samuel's responsibility to request instructions that address each theory of his case. (*Agarwal v. Johnson* (1979) 25 Cal.3d 932, 950-951, disapproved on another point by *White v. Ultramar* (1999) 21 Cal.4th 563, 574 fn. 4; *Starrh & Starrh Cotton Growers v. Aera Energy LLC* (2007) 153 Cal.App.4th 583, 600, fn. 1.) His failure to do so here forfeits this claim on appeal.

Finally, Samuel asserts the trial court erred in giving CACI No. 1207B because it is not a correct statement of the law. He contends that under *Wimberly v. Derby Cycle Corp.* (1997) 56 Cal.App.4th 618, 633, the instruction should not be given where a manufacturer of a defective product is attempting to shift blame to other parties in the product's chain of distribution. He argues the instruction is intended for third persons who are not in the chain of distribution and does not apply to Builders and Rebel, who were both in the chain of distribution and, under strict products liability law, are jointly and severally liable for all of his harm.

As Builders asserts, the jury never reached the issue of comparative fault because it found in Builders' favor on the strict products liability claims, as it determined the gate system's design was not a substantial factor in causing harm to Samuel and Builders did not fail to adequately warn of potential risks. Builders claims this shows there can be no prejudice even if the instruction were erroneous. In his opening brief, Samuel asserts the instruction was prejudicial because it "clearly caused the jury to believe that if they thought Rebel was solely at fault for the defective Gate Stop, then Builders was not responsible at all." The jury was instructed, however, that if it found Builders' negligence or defective product was a substantial factor in causing Samuel's harm, then Builders was responsible for the harm and could not avoid responsibility just because another person, condition or event was also a substantial factor in causing Samuel's

17.

harm. Thus, the jury was instructed to determine Builders' liability apart from Rebel's. We must presume the jurors followed the court's instructions. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852; *Craddock v. Kmart Corp.* (2001) 89 Cal.App.4th 1300, 1308.)

*Sufficiency of the Evidence*

Samuel argues there was insufficient evidence to support the jury's findings that (1) the "Gate System's design" was not a substantial factor in causing Samuel's injuries, and (2) Builders did not "fail to adequately warn of the potential risks." On issues where Samuel had the burden of proof, we must affirm unless it would be impossible for any rational fact finder to reject his showing. (*Blank v. Coffin* (1942) 20 Cal.2d 457, 461-462 [126 P.2d 868] [jury's failure to find fact is erroneous only if "evidence contrary to the existence of the fact is clear, positive, uncontradicted, and of such a nature that it cannot rationally be disbelieved"]; *Byrum v. Brand* (1990) 219 Cal.App.3d 926, 946-947; *Horn v. Oh* (1983) 147 Cal.App.3d 1094, 1099.)

Where Builders had the burden of proving a defense, we must affirm if there was substantial evidence supporting the defense. "When an appellant asserts there is insufficient evidence to support the judgment, our review is circumscribed. [Citation.] We review the whole record most favorably to the judgment to determine whether there is substantial evidence – that is, evidence that is reasonable, credible, and of solid value – from which a reasonable trier of fact could have made the requisite finding under the governing standard of proof." (*In re Jerry M.* (1997) 59 Cal.App.4th 289, 298.)

"Strict liability has been imposed for three types of product defects: manufacturing defects, design defects, and '"warning defects."'" (*O'Neil, supra,* 53 Cal.4th at p. 347.) Here, Samuel claimed Builders was strictly liable for his injuries on the basis that its product was defective due to either a design defect or a warning defect, i.e. a product that is dangerous because it lacks adequate warnings or instructions. (*Ibid.*) Strict liability for a "design defect" may be established under two alternative tests, commonly known as the "consumer expectation" and "risk-benefit" tests. (*Soule, supra,* 8 Cal.4th at pp. 563-

18.

564; *Barker v. Lull Engineering Co., Inc.* (1978) 20 Cal.3d 413, 432 (*Barker*).) A product is defective in design if: (1) the product fails to perform as safely as the ordinary customer would expect when used in an intended or reasonably foreseeable manner; or (2) the benefits of the challenged design do not outweigh the risk of danger inherent in such design. (*Barker*, *supra*, 20 Cal.3d at p. 418.) Under either test, a plaintiff must prove that the defect caused injury. (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 479; *Soule*, *supra*, 8 Cal.4th at p. 572.)

In making their appellate arguments on the issue of sufficiency of the evidence, both parties cite to case law which they claim supports their respective positions, i.e. whether the evidence shows this is a chain of distribution case or a component parts case, or whether there was a duty to warn or causation. We note that the jury was not instructed with the law as stated in these cases. Instead, it was generally instructed with the following CACI instructions on strict liability: CACI 1200. Strict Liability – Essential Factual Elements; CACI 1203. Strict Liability – Design Defect – Consumer Expectation Test – Essential Factual Elements; CACI 1204. Strict Liability – Design Defect – Risk-Benefit Test – Essential Factual Elements – Shifting Burden of Proof; CACI 1205. Strict Liability – Failure to Warn – Essential Factual Elements. The jury was then asked to complete a detailed special verdict form.

Other than Samuel's contention that the trial court erroneously rejected his special instruction, which we have rejected, Samuel does not claim the jury instructions on strict liability or the special verdict form were erroneous. Accordingly, the rules against which we measure the evidence adduced at trial are properly located in the jury instructions. (*Null v. City of Los Angeles* (1988) 206 Cal.App.3d 1528, 1534-1535.) "[W]here a party to a civil lawsuit claims a jury verdict is not supported by the evidence, but asserts no error in the jury instructions, the adequacy of the evidence must be measured against the instructions given the jury." (*Id.* at p. 1535.)

19.

Here, the jury was instructed that Samuel had the burden of proving causation, i.e. either that the "Gate System's failure to perform safely was a substantial factor" in causing Samuel's harm or the "Gate System's design was a substantial factor in causing harm to Samuel." It was further instructed that "[a] substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm. It must be more than a remote or trivial factor. It does not have to be the only cause of the harm. [¶] Conduct is not a substantial factor in causing harm if the same harm would have occurred without that conduct." Under both tests, the jury was asked on the special verdict form whether the gate system's design was a substantial factor in causing harm to Samuel. The jury answered both questions in the negative.

There was evidence to support these findings. The jury could have found the "Gate System" included only those parts that Builders shipped and excluded the gate stop manufactured and installed by Rebel. There was also evidence that the gate stop was defective and the gate fell due to that defect, thereby causing Samuel's injuries. Based on this evidence, the jury could have found that (1) the gate system as installed by Rebel failed to perform as safely as an ordinary consumer would expect, since it was the gate that fell on Samuel while he was attempting to close it, and (2) Samuel's injuries were not caused by the gate system's design, but rather by the defective gate stop which allowed the gate to fall.

Samuel also asserts there was insufficient evidence to support the jury's finding that the risks of the gate system's design did not outweigh the benefits. The jury was instructed, under the risk-benefit test, that if Samuel proved that Builders manufactured, distributed or sold the gate system, Samuel was harmed, and the gate system's design was a substantial factor in causing Samuel's harm, then it must find for Samuel unless Builders proved that the benefits of the gate system's design outweighed the risks of that design. Here, the jury found both that the gate system's design was not a substantial factor in causing Samuel's harm and that the risk of the gate system's design did not

20.

outweigh its benefits. Since the jury's finding on causation is supported by the evidence, we do not determine whether there was also evidence to support the jury's finding in Builders' favor on its defense.

With respect to failure to warn, the jury was instructed that Samuel claimed the gate system, as designed and supplied by Builders, lacked sufficient instructions or warning of potential risks, which required Samuel to prove: (1) that Builders "manufactured, distributed or sold the Gate System"; (2) the "Gate System had potential risks that were known or knowable in light of the scientific knowledge that was generally accepted in the scientific community at the time of manufacture, distribution or sale"; (3) "the potential risks presented a substantial danger when the Gate System is used or misused in an intended or reasonably foreseeable way"; (4) "ordinary consumers would not have recognized the potential risks"; (5) Builders "failed to adequately warn or instruct of the potential risks"; (6) Samuel "was harmed"; and (7) "the lack of sufficient instructions or warnings was a substantial factor in causing" Samuel's harm.

The jurors found that while the "Gate System" had potential risks which presented a substantial danger to persons using or misusing it, and that ordinary consumers would not have recognized the potential risks, Builders did not "fail to adequately warn of the potential risks." Samuel asserts the jury's finding that Builders did not fail to adequately warn is unsupported by the evidence because the "undisputed evidence" established that Builders did not provide any warnings to its customers or users regarding the use of an adequate gate stop.

The jury could have found, however, that while Builders did not provide written or oral warnings to the contractors when they purchased products from Builders, such warnings were unnecessary because the contractors were aware of the need for gate stops in certain installations. The evidence showed that Builders sells gate parts to licensed C-13 contractors such as Rebel, who know how to manufacture and install effective gate stops. Rebel's manager Moser admitted that it is obvious a gate stop is necessary to

21.

ensure the gate does not roll off the track and that it was not necessary to warn or remind Rebel of the need for a gate stop. Moreover, Builders advised architects in promotional materials, which were in Rebel's possession, that "contractors shall install any gate stops that may be required." Based on the evidence, the jury reasonably could have concluded, as it did, that Builders did not fail to adequately warn of the potential risks of failing to install an adequate gate stop.

In reply, Samuel asserts that the jury could not have reached this conclusion because it was never instructed on the sophisticated user or purchaser defense, which he claims the trial court found inapplicable. The jury instruction conference was held off the record. The following day, the court gave the parties the opportunity to place on the record their concerns regarding the instructions and special verdict. Nothing in the record indicates that either party requested an instruction on the sophisticated user defense,[2] or that the trial court found such an instruction inapplicable.

Samuel contends the lack of instruction on the sophisticated user defense prevents Builders from pointing to the evidence regarding Rebel's knowledge as supporting the verdict. But Builders' argument on this issue was based on the evidence adduced at trial and went, not to the sophisticated user defense, but to whether an adequate warning was given. Specifically, Builders argued, without objection: "Failure to warn. Of what? Of what? What am I gonna warn Mr. Moser of? He knows that if a gate is not controlled, it's gonna fall over and hurt someone. He knows it needs a stop. [¶'s] . . . Rebel . . . had all of these stops available to them at the time this accident occurred. They admit it.

---

[2] The affirmative defense of a sophisticated user is contained in CACI No. 1244 as follows: "[*Name of defendant*] claims that [he/she/it] is not responsible for any harm to [*name of plaintiff*] based on a failure to warn because [*name of plaintiff*] is a sophisticated user of the [*product*]. To succeed on this defense, [*name of defendant*] must prove that, at the time of the injury, [*name of plaintiff*], because of [his/her] particular position, training, experience, knowledge, or skill, knew or should have known of the [*product*]'s risk, harm, or danger."

They knew a stop needed to be placed. The only problem is Rebel Fence was so incompetent that they didn't understand that their designed wheel stop is a piece of junk . . . [¶'s] Mr. Flynn admits that . . Rebel knew. We've got the OSHA regulations. They're a licensed C-13 contractor that they were supposed to be aware of because they do commercial work. [¶] We've got the ASTM standards and the DASMA standards, all talk about you need a stop. It's on the test. They've got our catalog that's got pictures of the stops that were available from Builders Fence Company. They've got the Elite SL3000 installation manual that not only tells 'em, but shows 'em pictures of how stops ought to be placed and where they ought to be placed. . . . So it's not that they didn't know. They knew. [¶'s] . . . Mr. Flynn, he couldn't figure out what to do with that so he decided we didn't actually have to warn 'em, we had to remind 'em. So he's invented a new theory. It's a failure to remind. You're not gonna see that in the jury instructions. That's not recognized in the State of California. You don't have liability for failing to remind a licensed contractor to be competent and actually do their job. [¶] So as you work down through the sheet, did we fail to warn? No."

Builders' argument, both below and on appeal, is that Rebel was adequately warned because it was aware, through contractor's materials, regulations, the installation manual, and common sense, that an adequate gate stop was needed. Substantial evidence supports this argument. Accordingly, there is no basis for reversal on this point.

Even if the evidence were insufficient, however, the jury also found, in determining whether Builders was liable for negligent failure to warn, that Builders' failure to warn was not a substantial factor in causing Samuel's harm. Samuel argues it was undisputed that the lack of warnings was a substantial factor in causing his injuries. We disagree. The evidence showed that Rebel already knew, without any warning from Builders, that a gate stop was needed on the Shirk project, and, as Moser testified, there was no need to be warned or reminded that a gate stop was necessary. While Samuel points to Moser's testimony that he would have followed any instructions Builders

23.

provided, the jury could have rejected this testimony, particularly in light of Moser's inability to explain how providing a warning would have helped. Instead, the jury could have accepted the testimony of Builders' expert, Quan, that in light of Rebel's knowledge that a gate stop was needed, a warning would not have made a difference.

In sum, Samuel has failed to show that he was entitled to a finding that Builders was strictly liable as a matter of law.

## DISPOSITION

The judgment is affirmed. Costs on appeal are awarded to respondent.

_____

Gomes, J.

WE CONCUR:


_____

Hill, P.J.


_____

Kane, J.