Filed 7/26/23  Shelton v. Hyundai Motor America CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| JAMES SHELTON,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>HYUNDAI MOTOR AMERICA,<br><br>Defendant and Respondent. | B319440<br><br>(Los Angeles County Super. Ct. No. 19STCV45621) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Stephanie M. Bowick, Judge.  Affirmed in part, reversed in part, and remanded.

MLG, Jonathan A. Michaels and Christopher D. Henderson, for Plaintiff and Appellant.

Lewis Brisbois Bisgaard & Smith, Anthony E. Sonnett and Jocelyn A. Julian, for Defendant and Respondent.

Plaintiff James Shelton (plaintiff) was injured when his fingers were caught in the window of his vehicle, a Hyundai Equus.  Plaintiff sued the vehicle's distributor, Hyundai Motor America (defendant).  In this appeal from the trial court's grant of defendant's motion for summary judgment, we are asked to decide whether plaintiff raised triable issues of fact as to his claims for negligence and strict products liability that allege both design and manufacturing defects.

## I.  BACKGROUND

### A.    *The Hyundai Equus and Plaintiff's Injury*

Plaintiff leased and subsequently purchased a 2016 Hyundai Equus, which is equipped with power windows.  As stated in the owner's manual, an "[a]uto [u]p/[d]own" feature enables users to "completely raise or lower the window[ ] even when the switch is released" by "[m]omentary pressing or pulling up of the [p]ower [w]indow [s]witch . . . ."  An "[a]utomatic [r]everse" feature ensures that "[w]hen a window sensor detects any obstacle while automatically closing the window, the window will stop the upward movement, and then be lowered by approximately 12 in (30 cm) to allow the object to be cleared."  The discussion of the automatic reverse feature in the owner's manual is accompanied by an illustration of a teddy bear caught between a window and window frame.  A separate text box on the same page labeled "WARNING" indicates that "[o]bjects[ ] which are less than 0.16 in. (4 mm) in diameter and caught between the window and the upper window frame[ ] may not be detected by the automatic reverse sensor.  Thus, the window operation will not automatically stop and be reversed."

2

At the time of plaintiff's injury, plaintiff's son Coleman Shelton (Coleman) was in the driver's seat. Plaintiff was entering the front passenger door. In deposition testimony, Coleman explained that he "went to lower the window to ask [his] dad a question," but when he saw "the door was already open," he "just rolled the window up . . . ." When asked whether he rolled the window up "in the way that it would automatically raise to the top or . . . kept [his] finger on it till it got to the top position," Coleman testified he "had done it to where it went automatically to the top." Four fingers on plaintiff's right hand were crushed in the window.

Plaintiff went to the emergency room, where he was diagnosed with a "fully severed right ring finger and a severe degloving avulsion injury to the other fingers of his right hand." He required surgery to repair the damage to his ring and middle fingers.

B.    *The Operative Complaint*

As pertinent to this appeal, plaintiff's first amended complaint asserted three causes of action against defendant: negligence, strict products liability based on a design defect, and strict products liability based on a manufacturing defect.[1] The complaint focused on the Equus's alleged non-compliance with

---

[1]    Plaintiff also asserted causes of action for breach of express warranty and breach of the implied warranty of merchantability. Plaintiff does not challenge the trial court's summary adjudication of these causes of action.

certain provisions of the Federal Motor Vehicle Safety Standards (FMVSS).[2]

FMVSS No. 118 "specifies requirements for power operated window, partition, and roof panel systems to minimize the likelihood of death or injury from their accidental operation." (49 C.F.R. § 571.118, S1.) Generally described, FMVSS No. 118, subdivision S4 (hereafter Subdivision S4) provides that, "[e]xcept as provided in S5," power windows may operate only in specified circumstances in which the operator will likely be aware of anything in a window's path and/or able to stop and reverse the window in the event of contact. (49 C.F.R. § 571.118, S4.) Also generally described, FMVSS No. 118, subdivision S5 (hereafter Subdivision S5) requires that power windows that may be closed "under any circumstances other than those specified in S4" automatically stop and reverse when they encounter certain obstacles. (49 C.F.R. § 571.118, S5.)

In his cause of action for negligence, plaintiff alleged defendant "had a duty to use reasonable care in marketing, advertising, and distribut[ing] . . . the 2016 Hyundai Equus, such that the vehicle would function[ ] safely in foreseeable circumstances." Plaintiff alleged defendant breached this duty "by distributing and placing into the stream of commerce the 2016 Hyundai Equus with a defective automatic power window system in violation of FMVSS No. 118."

Plaintiff's strict products liability causes of action included allegations that the Equus did not perform as safely as an

---

[2]    The FMVSS are promulgated by the National Highway Traffic Safety Administration pursuant to the National Traffic and Motor Vehicle Safety Act of 1966. (49 C.F.R. § 571.1.)

ordinary consumer would have expected and that it suffered from a manufacturing defect when it left defendant's possession. He elaborated on these theories in his responses to defendant's interrogatories. In his summary of the facts supporting both the design defect and manufacturing defect theories, plaintiff emphasized statements in the owner's manual describing the automatic reverse feature and plaintiff took the position that FMVSS No. 118 requires the Equus to incorporate this feature.

C.    *Summary Judgment Proceedings*
1.    *Defendant's motion*
Defendant moved for summary judgment or, in the alternative, summary adjudication as to each cause of action. As to the negligence cause of action, defendant argued it had no duty as a distributor to duplicate the manufacturer's safety testing (Hyundai Motor Company is the manufacturer and was not named as a defendant) in the absence of any reason to believe the Equus was defective.

With respect to the design defect cause of action, defendant argued plaintiff misconstrued FMVSS No. 118. Plaintiff's view that FMVSS No. 118 requires compliance with Subdivisions S4 *and* S5—in effect, that all vehicles must incorporate the automatic reverse feature described in Subdivision S5—conflicts with the plain text of the standard, which makes clear that a vehicle need only comply with *either* Subdivision S4 or S5. Defendant submitted a declaration by Robert Lange, an automotive engineer, endorsing its construction of FMVSS No. 118. Because there was no evidence that plaintiff's Equus did not conform to Subdivision S4 (restricting the circumstances under which the power windows can be operated), defendant argued

5

non-conformity with Subdivision S5 (the window's failure to automatically stop and reverse) did not support plaintiff's design defect cause of action.

Finally, with respect to the manufacturing defect cause of action, defendant argued statements in the owner's manual regarding the automatic reverse feature did not establish plaintiff's Equus differed from design specifications or typical units of the same product line. Defendant contended the statement in the owner's manual that the automatic reverse feature will engage "[w]hen a window sensor detects any obstacle" did not support plaintiff's claim because there was "no evidence that the specific circumstances of this incident were among those that the sensor was intended to detect."

### 2. *Plaintiff's opposition*

In his opposition, plaintiff did not substantially elaborate on the nature of the duty he believes defendant owed him for purposes of his negligence claim. He argued only that defendant "was required to adhere to the standard of care that a reasonably careful distributor would use under similar circumstances" and suggested this included "ensuring that the Hyundai Equus's window's 'auto up' feature was compliant with FMVSS 118."

With respect to the design defect cause of action, plaintiff maintained that vehicles must conform to Subdivisions S4 and S5 and his car's lack of an effective automatic reverse feature violated these standards. In the alternative, plaintiff emphasized that compliance with FMVSS No. 118 does not preclude recovery on a design defect theory. He did not, however, articulate an alternative basis for finding the Equus's design to be defective.

6

With respect to the manufacturing defect cause of action, plaintiff argued the owner's manual supports an inference that the Equus's power window system was designed to automatically reverse when obstructed by a human hand.

3. *The hearing and plaintiff's supplemental opposition*

The trial court held a hearing on defendant's motion in December 2021. The appellate record does not include a reporter's transcript of the hearing, but the trial court's minute order indicated the court would "issue its final ruling . . . with no further argument by the parties."

Shortly after the hearing, however, plaintiff filed an ex parte application to submit supplemental briefing. He contended further briefing was warranted because his expert, David Bosch (Bosch), did not inspect the vehicle until two days before the summary judgment hearing and Bosch's tests found the offending window exerted an amount of force greater than that at which automatic reverse is required to activate under Subdivision S5. In discussing Bosch's findings, plaintiff also reframed his legal argument. Whereas plaintiff previously relied on FMVSS No. 118 to establish defendant's liability, he now deemed it a "red herring" and argued compliance with the standard did not shield defendant from liability. Plaintiff suggested the design defect cause of action should be analyzed under the consumer expectations or risk-benefit tests described in products liability case law.

Defendant opposed plaintiff's ex parte application to submit further briefing as untimely, and the trial court denied the

application on that basis.  The trial court ruled "[n]o additional briefing or new material [would] be considered."

### 4.    *The order granting defendant's motion for summary judgment*

The trial court granted summary judgment for defendant.  With respect to the negligence cause of action, the trial court reasoned "[d]efendant . . . established that it is not liable . . . because [p]laintiff . . . submitted no evidence of a manufacturing defect or distribution of a defective product, and therefore, no legal duty was owed to [p]laintiff."

The trial court's analysis of plaintiff's design defect cause of action focused on FMVSS No. 118.  Because there was no genuine dispute that the Equus was engineered to satisfy Subdivision S4, it was not required to include the automatic reverse feature described in Subdivision S5.  The trial court held that plaintiff "relie[d] upon an erroneous reading of FMVSS Number 118."

With respect to the manufacturing defect cause of action, the trial court determined the alleged violation of FMVSS No. 118 did not constitute a defect for the reasons we have already mentioned.  The trial court further found plaintiff did not "set forth facts and evidence to conclude that the manufacturer intended for [his car] to have the 'automatic "stop-and-reverse" feature' or that [his car] differ[ed] from other 2016 Hyundai Equus[es]."

## II.  DISCUSSION

Summary adjudication of plaintiff's design defect and negligence causes of action was proper.  Plaintiff's negligence claim fails because a distributor has no duty to inspect a product

8

manufactured by a third party where, as here, there is no evidence defendant knew or had reason to know it was defective. As for the design defect cause of action, plaintiff would have been entitled to have that claim analyzed under the consumer expectations test or the risk-benefit test if he had provided evidence or argument relevant to either, but he did not do so—thereby forfeiting the issues. Instead, he relied solely on a flawed understanding of FMVSS No. 118 that he himself later characterized as a red herring. Plaintiff does not contest the forfeiture, and we decline to exercise our discretion to attempt to apply either of these other tests for the first time on appeal.

The trial court erred, however, in summarily adjudicating plaintiff's manufacturing defect cause of action because there is a triable issue as to whether the window that caused plaintiff's injury performed as intended. The owner's manual indicates that when the auto-up feature is engaged—as Coleman testified it was—the window should stop and reverse if it encounters an object at least four millimeters in diameter. Defendant does not dispute that plaintiff's fingers satisfy this criterion, that plaintiff was using the car in a reasonably foreseeable way, or that he would not have been injured if the window functioned as described in the owner's manual.

### A. Evidentiary Issues

Before we get to the merits of the causes of action at issue, we must briefly discuss plaintiff's contention that the trial court abused its discretion in excluding certain evidence presented in opposition to defendant's motion. First, plaintiff contends the trial court erred in sustaining a foundation objection to a statement in his declaration suggesting Coleman closed the

9

window using the auto-up feature. Second, plaintiff contends the trial court erred in sustaining a foundation objection to a statement in his attorney's declaration identifying selected pages from the Equus's owner's manual.

Any error in excluding this evidence was harmless because it was cumulative of other evidence in the record. (*Robinson v. U-Haul Co. of California* (2016) 4 Cal.App.5th 304, 323.) The circumstances of plaintiff's injury, including Coleman's use of the auto-up feature, were described in Coleman's deposition testimony. The selected pages of the owner's manual were included in defendant's exhibits submitted in support of the motion for summary judgment.

B.  *No Trial Is Required to Decide the Negligence Claim Because Defendant Had No Duty to Test the Equus's Power Windows*

In contrast to plaintiff's strict products liability causes of action, which focus on the product itself, plaintiff's negligence cause of action focuses on the reasonableness of defendant's conduct. (*Barker v. Lull Engineering Co.* (1978) 20 Cal.3d 413, 434 (*Barker*).) "The elements of any negligence cause of action are duty, breach of duty, proximate cause, and damages." (*Peredia v. HR Mobile Services, Inc.* (2018) 25 Cal.App.5th 680, 687.) Here, plaintiff's negligence claim assumes defendant, in its capacity as the Equus's distributor, had a duty to inspect a vehicle manufactured by a third party in the absence of any indication that it was defective.[3] The law is to the contrary.

---

[3]  Plaintiff cites no evidence that defendant played any role in the design or manufacture of the Equus. His suggestion that

10

The Restatement Second of Torts explains "[a] seller of a chattel manufactured by a third person, who neither knows nor has reason to know that it is, or is likely to be, dangerous, is not liable in an action for negligence for harm caused by the dangerous character or condition of the chattel because of his failure to discover the danger by an inspection or test of the chattel before selling it." (Rest.2d Torts, § 402; *Canfield v. Security-First Nat. Bank* (1939) 13 Cal.2d 1, 30-31 [although the Restatement "does not constitute a binding authority, considering the circumstances under which it has been drafted, and its purposes, in the absence of a contrary statute or decision in this state, it is entitled to great consideration as an argumentative authority"].) At least one California court has endorsed similar principles. (*Tourte v. Horton Manufacturing Co.* (1930) 108 Cal.App. 22, 23 [adopting statements that "'[a] dealer who purchases and sells an article in common and general use in the usual course of trade and business, without knowledge of its dangerous qualities, is not under a duty to exercise ordinary care to discover whether it is dangerous or not'" and "[a] dealer is under no duty or obligation to examine the articles which he sells to ascertain whether there are defects therein, and . . . is not liable for an injury arising from such defects where he had no actual knowledge thereof'"], superseded by statute on other grounds as stated in *Tremeroli v. Austin Trailer Equipment Co.* (1951) 102 Cal.App.2d 464, 476-477.)

---

defendant may be characterized as a manufacturer under federal law (49 U.S.C. § 30102(a)(6)(B)) does not alter the scope of the conduct that may give rise to liability for negligence.

11

In addition, the factors set forth in *Rowland v. Christian* (1968) 69 Cal.2d 108 (*Rowland*) confirm defendant had no duty to inspect the Equus's power windows. The *Rowland* factors include "foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." (*Id.* at 113.)

The *Rowland* factors are not accorded equal weight. Our Supreme Court has repeatedly emphasized that foreseeability of harm is the most important factor. (*T.H. v. Novartis Pharmaceuticals Corp.* (2017) 4 Cal.5th 145, 166; *Kesner v. Superior Court* (2016) 1 Cal.5th 1132, 1145.) Indeed, "'[i]f the court concludes the injury was not foreseeable, there was no duty [and t]here is no need to discuss the remaining considerations.' [Citation.]" (*Tucker v. CBS Radio Stations, Inc.* (2011) 194 Cal.App.4th 1246, 1253.) Here, there is no evidence defendant had reason to believe the Equus's power window safety features might not function as designed in plaintiff's car. Under these circumstances, the injury plaintiff suffered was not foreseeable and defendant had no duty to inspect the window to ensure it was working properly.

Plaintiff alternatively argues the alleged violation of FMVSS No. 118 constitutes negligence per se. "Evidence Code section 669 allows proof of a statutory violation to create a presumption of negligence in specified circumstances. It codifies

12

the common law doctrine of negligence per se, pursuant to which statutes and regulations may be used to establish duties and standards of care in negligence actions." (*Elsner v. Uveges* (2004) 34 Cal.4th 915, 927, footnotes omitted; Evid. Code, § 669, subd. (a)(1) [a person's failure to exercise due care "may be presumed" if, among other things, they "violated a statute, ordinance, or regulation of a public entity"].)

Plaintiff's negligence per se theory is forfeited because he failed to raise it in the trial court, but his reading of FMVSS No. 118 lacks merit in any case. The plain text of Subdivisions S4 and S5 indicates they are alternatives: Subdivision S4 limits the circumstances under which power windows may operate "[e]xcept as provided in S5," and Subdivision S5 requires an automatic reverse feature if the windows may be operated "under any circumstances other than those specified in S4." Contrary to plaintiff's suggestion that the Equus is subject to Subdivision S5 because Subdivision S4 does not expressly mention an auto-up feature, Subdivision S4 does impose restrictions on auto-up features, albeit restrictions that do not call for an automatic reverse mechanism. The only restrictions in Subdivision S4 on operation of a window from a switch in the vehicle's interior (regardless of whether the switch requires continuous pressure) are those set forth in S4(a) and S4(e): so long as the switch is operable only when the ignition is in the "on," "start," or "accessory" position (S4(a)) or "[d]uring the interval between the time the locking device which controls the activation of the vehicle's engine is turned off and the opening of either of a two-door vehicle's doors or, in the case of a vehicle with more than two doors, the opening of either of its front doors" (S4(e)), the

13

standard is satisfied.  Nothing in the appellate record indicates plaintiff's vehicle did not meet these conditions.

### C.     *Plaintiff Raised No Triable Issues as to Design Defect*

"The existence of a design defect may be established according to one of two alternative tests.  [Citation.]  First, under the so-called consumer expectations test, a design is defective 'if the plaintiff demonstrates that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.'  [Citation.]  Second, under the risk-benefit test articulated in *Barker*[, *supra*, 20 Cal.3d 413], a design is defective 'if through hindsight the jury determines that the product's design embodies "excessive preventable danger," or, in other words, if the jury finds that the risk of danger inherent in the challenged design outweighs the benefits of such design.'  [Citation.]"  (*Kim v. Toyota Motor Corp.* (2018) 6 Cal.5th 21, 30 (*Kim*).)

Plaintiff contends the trial court erred in failing to analyze his design defect claim under either the consumer expectations or risk-benefit test, instead focusing on the "ancillary" issue of whether the Equus's power windows conform to FMVSS No. 118.  Plaintiff is correct that FMVSS compliance is not dispositive of his design defect claim (see 49 U.S.C. § 30103(e) [""Compliance with a motor vehicle safety standard prescribed under this chapter does not exempt a person from liability at common law"], but the trial court's focus on FMVSS compliance was the result of *plaintiff's* framing of the issue.  Although the operative complaint included a boilerplate allegation that the Equus "did not perform as safely as an ordinary consumer would have expected," plaintiff did not so much as mention either the consumer expectations test

14

or the risk-benefit test in his opposition to defendant's summary judgment motion. Instead, he relied exclusively on the Equus's alleged violation of FMVSS No. 118 to establish a design defect. Plaintiff did discuss the consumer expectations and risk-benefit tests in his supplemental opposition (for the first time), but he mounts no serious challenge to the trial court's decision not to permit supplemental briefing.[4]

Under these circumstances, the issue of whether defendant might be liable on a design defect theory under the consumer expectations or risk-benefit tests is forfeited.[5] (*Meridian Financial Services, Inc. v. Phan* (2021) 67 Cal.App.5th 657, 698 ["[the] [a]ppellants' summary judgment opposition brief raised no dispute regarding" forfeited issue]; *Jimenez v. 24 Hour Fitness USA, Inc.* (2015) 237 Cal.App.4th 546, 567 [declining to consider an argument the appellants "did not pursue . . . below in either their opposition to the summary judgment motion or during oral argument on the motion"].) The fact that plaintiff alluded to the consumer expectations test in his complaint is immaterial. (*Saville v. Sierra College* (2005) 133 Cal.App.4th 857, 873 [the party opposing summary judgment has the "duty . . . to direct the

---

[4]    Plaintiff only suggests the trial court should have permitted supplemental briefing to consider Bosch's data concerning the force exerted by the Equus's power windows in relation to FMVSS No. 118. Any error on this point was harmless because, as we have already explained, plaintiff misunderstands FMVSS No. 118.

[5]    Plaintiff does not address forfeiture in his appellate briefs despite defendant's argument that he should not be permitted to raise a new theory on appeal.

court's attention to any different factual basis of liability on which he could rely"].)

We do have discretion to consider a question of law when the facts are undisputed (*Wisner v. Dignity Health* (2022) 85 Cal.App.5th 35, 44-45; *Souza v. Westlands Water Dist.* (2006) 135 Cal.App.4th 879, 898-899), but such an exercise of discretion would be inappropriate here. This appeal does not raise broadly significant legal issues, and the factual record developed in the motion for summary judgment was based on plaintiff's position—implied in the complaint and confirmed in his interrogatory responses—that his design defect claim rested on FMVSS No. 118.

### D.     Plaintiff Has Raised a Triable Issue as to Manufacturing Defect

"In tort law, a manufacturer is liable 'if a defect in the manufacture or design of its product causes injury while the product is being used in a reasonably foreseeable way.'" (*Kim*, *supra*, 6 Cal.5th at 30, quoting *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 560.) "The manufacturer may be held strictly liable for such injuries without regard to whether the manufacturer acted negligently in designing or manufacturing the product. The doctrine of strict products liability 'focusses not on the conduct of the manufacturer but on the product itself, and holds the manufacturer liable if the product was defective.' [Citation.]" (*Ibid.*) Our Supreme Court has held that product distributors, not just the actual product manufacturer, can be held liable for manufacturing defects in a products liability case. (*Vandermark v. Ford Motor Co.* (1964) 61 Cal.2d 256, 262-263 ["Strict liability on the manufacturer and retailer alike affords

16

maximum protection to the injured plaintiff and works no injustice to the defendants, for they can adjust the costs of such protection between them in the course of their continuing business relationship.  Accordingly, as a retailer engaged in the business of distributing goods to the public, [the car dealership] is strictly liable in tort for personal injuries caused by defects in cars sold by it"].)

A product suffering from a manufacturing defect "differs either from what the manufacturer intended or from the standard items in the manufacturer's same product line."  (*Gall v. Smith & Nephew, Inc.* (2021) 71 Cal.App.5th 117, 124, citing *Barker*, *supra*, 20 Cal.3d at 429; *Webb v. Special Electric Co., Inc.* (2016) 63 Cal.4th 167, 180 ["Manufacturing defects can arise, for example, when a flaw in the manufacturing process creates a product that differs from what the manufacturer intended"].) Here, the Equus owner's manual supports the inference that the automatic reverse feature failed to function as intended in plaintiff's car.[6]  Automatic reverse is supposed to activate when the window sensor "detects any obstacle while automatically closing the window," and Coleman testified that he closed the window using the function "where it went automatically to the top."  The only potentially material exception indicated in the owner's manual is that the sensor may not detect "[o]bjects less than 0.16 in. (4 mm) in diameter."

---

[6]     Although the trial court understood plaintiff to take the position that the alleged violation of FMVSS No. 118 constituted a manufacturing defect, plaintiff expressly argued that "[i]t can be inferred from the [o]wner's [m]anual that the Hyundai Equus's automatic power . . . window system was created to 'stop-and-reverse' when obstructed by objects such as a human hand."

The foregoing suggests the manufacturer intended for the window to stop and reverse when the auto-up feature is engaged and the window is obstructed by any object at least four millimeters in diameter.  Defendant's contention that "[t]here is no evidence of what the intended design or specification for the subject vehicle even are" cannot be squared with this record.  Even if defendant is later able to marshal evidence for trial that qualifies or contradicts the statements in the owner's manual, the evidence at this stage is still sufficient to preclude summary adjudication.  Defendant does not suggest plaintiff's ring finger— let alone his ring finger plus the other digits initially caught in the window—is less than four millimeters in diameter.  Nor does defendant offer any reason to infer that fingers generally are not included in the class of "any obstacle" that the window's sensor is designed to detect.

The only element of plaintiff's manufacturing defect cause of action defendant challenged in its motion is the existence of a defect.  Defendant does not dispute that plaintiff held the door in a reasonably foreseeable manner or that the automatic reverse feature described in the owner's manual would have prevented his injuries.  Under these circumstances, summary adjudication should have been denied.

18

DISPOSITION

The judgment is reversed.  The cause is remanded with directions to vacate the order granting summary judgment and enter a new order (1) granting summary adjudication of plaintiff's causes of action for negligence, design defect, breach of express warranty, and breach of the implied warranty of merchantability and (2) denying summary adjudication of plaintiff's manufacturing defect cause of action.  Plaintiff is awarded costs on appeal.


NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS



BAKER, J.


We concur:



RUBIN, P. J.



KIM, J.



19